C
Only the Westlaw citation is currently available.

United States District Court,
N.D. Georgia, Atlanta Division.

UNITED PARCEL SERVICE OF AMERICA, INC.,
Plaintiff,
v.
JOHN DOES ONE THROUGH TEN, Defendants.

No. Civ.A. 1-03-CV-1639.

June 13, 2003.

*ORDER*

CAMP, J.

*1 WHEREAS, Plaintiff has filed an emergency motion requesting expedited discovery for the limited purposes of (a) securing the information necessary to identify the Defendants and determine the Defendants' locations and legal status and (b) preserving the information necessary for Plaintiff to prosecute its claims against Defendants; and

WHEREAS the Court has reviewed the record and Plaintiff's motion and has determined that Plaintiff has just need for the expedited discovery it requests by way of its motion,

IT IS HEREBY ORDERED that Plaintiff shall be permitted to take discovery immediately for the limited purposes of identifying the Defendants, determining the Defendants' location and legal status, and preserving evidence necessary for trial.

IT IS FURTHER ORDERED that Plaintiff may require full and complete responses to any subpoenas or other discovery it serves pursuant to this Order within three (3) calendar days of service.

2003 WL 21715365 (N.D.Ga.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

C
Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.

ENTERTAINMENT TECHNOLOGY CORPORATION
v.
WALT DISNEY IMAGINEERING, et al.

**No. Civ.A. 03-3546.**

Filed June 9, 2003.
Oct. 2, 2003.

represented by Paul G. Nofer, Klehr Harrison Harvey, Branzburg & Ellers, LLP, Phila, PA, Lead Attorney, Attorney to be Noticed, Ira A. Rosenau, Klehr, Harrison, Harvey, Branzburg & Ellers LLP, Philadelphia, PA, Attorney to be Noticed, for Entertainment Technology Corporation, Plaintiff.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, Pepper Hamilton LLP, Philadelphia, PA, Lead Attorney, Attorney to be Noticed, for Walt Disney Imagineering, Defendant.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, (See above for address), Lead Attorney, Attorney to be Noticed, for Walt Disney Imagineering Research & Development, Inc., Defendant.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, (See above for address), Lead Attorney, Attorney to be Noticed, for the Walt Disney Company, Defendant.

represented by James D. Hollyday, Laurence Z. Shiekman, Steven K Winnie, (See above for address), Lead Attorney, Attorney to be Noticed, for Walt Disney World Co., Defendant.

represented by Ira A. Rosenau, (See above for address), Attorney to be Noticed, for Environmental Tectonics Corporation, Counter Defendant.

*MEMORANDUM AND ORDER*

HUTTON, J.

*1 Currently before the Court are Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis and to Shorten Time to Respond to Motion (Docket No. 12), Defendants' Reply in Opposition thereto (Docket No. 20), and Plaintiff's Reply Memorandum in Further Support of its Motion (Docket No. 21).

I. *ISSUE PRESENTED*

Plaintiff Entertainment Technology Corporation ("ETC") seeks leave to conduct expedited discovery of documents concerning safety tests performed on "Mission: Space," a new ride at Walt Disney World's Epcot theme park. Plaintiff asserts expedited discovery of these documents is necessary to protect the public interest and ETC's contractual rights. Defendants Walt Disney Imagineering, Walt Disney Imagineering Research and Development, Walt Disney World Co., and Walt Disney Company (collectively referred to for purposes of this motion as "WDI") oppose the motion.

II. *FACTUAL BACKGROUND*

In January 2000 ETC and WDI entered into a contract involving the creation of Mission: Space, a new ride at the Epcot theme park in Florida. The parties' relationship dates back to at least August 1998. The Mission: Space ride is a space flight simulator that uses a multiple-arm centrifuge system to simulate the g-force load of space launch and re-entry. The ride was opened to the public on August 15, 2003. Beyond those facts, the parties characterize both the contract and their relationship very differently. ETC claims the contract gave it the responsibility to design and build the ride and to perform safety tests on the ride. WDI describes the contract as the "Material Procurement Contract," an agreement under which ETC was to provide certain goods and services for the ride.

At some point, the relationship soured and the original contract was altered by a series of changes. The one pertinent to this litigation is Change Order No. 22. The parties disagree how Change Order No. 22 affected the January 2000 contract. The basic dispute is over which party retained ultimate responsibility to complete the ride after the Change Order. WDI claims Change Order No. 22 gave Disney final say; ETC claims it retained final control.

In the present motion, Plaintiff ETC motions for leave to conduct expedited discovery of, among other requests, the following documents:

> All documents concerning the testing or analysis of the safety, functioning or performance of the Ride, including all components of the Ride, whether or not such testing or analysis was performed by Disney or another person or entity.

*See* Plf's Document Request No. 1, Ex. D. to Plf's Motion for Leave to Conduct Limited Discovery. The document request then lists the various categories of test data Plaintiff would like to discovery. Defendants oppose the motion, claiming expedition is not warranted and, in any event, the documents are proprietary.

A discovery request would not usually warrant the extended discussion of a full memorandum and order. However, much of the debate between the parties focuses on which legal standard should be applied to decide a motion for expedited discovery. The area of law is indeed very unclear. Plaintiff argues for an inquiry into the reasonableness of the discovery request, while Defendant argues the request must be analyzed under factors akin to those used to decide preliminary injunction motions. The Court agrees with Plaintiffs and will analyze the Plaintiff's motion according to the factors discussed below. Ultimately, Plaintiff's motion for expedited discovery is denied.

III. *LEGAL STANDARD*

*2 Federal Rule of Civil Procedure 26(d) requires that "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)." Rule 26(d) expressly provides for departure from the "meet and confer" process of Rule 26(f) if the parties agree to expedited discovery or if the Court so authorizes. Unlike other discovery provisions of the Federal Rules, Rule 26(d) does not provide a standard under which a court should decide expedited discovery motions. *See, e.g.*, Fed.R.Civ.P. 26(c) (providing that a party show "good cause" to get a protective order); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir.1994) (setting forth "good cause" test).

A survey of applicable case law, which until recently was scant, reveals that district courts in this circuit have used one of two standards to evaluate motions for expedited discovery. One standard analyzes expedited discovery requests as if they were actually requests for injunctive relief or for specific performance. This standard is understandably difficult to meet for the moving party. The other standard requires that the moving party show that the expedited discovery request is reasonable in light of all circumstances. Whether a request is reasonable, of course, changes depending on the circumstances of the case and timing of the motion. Both standards are discussed below, followed by an evaluation of which should be used in the present case.

A. *Standard One: The Notaro Factors*

In *Notaro v. Koch* the Court set forth four factors for analyzing motions for expedited discovery under Rule 30(a), used for depositions. 95 F.R.D. 403 (S.D.N.Y.1982). The moving party must demonstrate "(1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted." *Notaro*, 95 F.R.D. at 405. The four factors defined are akin to the factors used to weigh a motion for preliminary injunction because, under the circumstances of the *Notaro* case, Plaintiffs had requested simultaneously a preliminary injunction and an expedited deposition of then- Mayor of New York Edward Koch. The Court reasoned these stringent factors are appropriate to protect the defendants at such an early stage of litigation. *See Notaro*, 95 F.R.D. at 405 (citing 4A Moore's Federal Practice, para. 30.54 (1982)).

A magistrate judge in the United States District Court for the District of New Jersey was first in the Third Circuit to apply the *Notaro* analysis to a motion for expedited discovery. In *Gucci America, Inc. v. Daffy's, Inc.*, the court applied *Notaro* because the discovery request, although procedural in name, had a substantive element to it, similar to a request for equitable relief. *See* 2000 U.S. Dist. LEXIS 16714 (D.N.J. Nov. 14, 2000). In the case, Gucci sued Daffy's, a chain of retail clothing stores specializing in selling well-known brands at discounted prices, claiming that Daffy's sold counterfeit Gucci handbags. Gucci requested expedited discovery of the names of the alleged Gucci distributors who were selling Gucci products to Daffy's. Analyzing the motion, the Court looked behind the pleadings, implying that the entire litigation was a sham in order for Gucci to learn the identity of, and then to punish, these distributors. *See Gucci*, 2000 U.S. Dist. LEXIS, at *18-19. Once in possession of the distributors' names, said the Court, "Gucci will be able to act ... without the aid of the Court." *Id.* at *17. The Court found the preliminary inunction factors of Notaro to be appropriate because of the Court's "darker suspicion" that Gucci was using the discovery motion and the overall litigation process to root out certain Gucci distributors. *See id.* at *18. Ultimately, Gucci could not meet the preliminary injunction requirements and its expedited discovery motion was denied.

B. *Standard Two: Reasonableness Inquiry*

*3 Other courts have analyzed expedited discovery motions using more liberal standards than the *Notaro* factors. While no one case provides a comprehensive standard as does *Notaro*, a review of the case law reveals an emerging reasonableness inquiry based on many different factors, including some preliminary injunction factors.

Many of the cases involve expedited discovery that is necessary to gather evidence for a pending preliminary injunction hearing. [FN1] In *Philadelphia Newspaper, Inc. v. Gannett Satellite Information Network, Inc.*, a court in the Eastern District of Pennsylvania noted that "expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." 1998 U.S. Dist. LEXIS 10511, at *4 (E.D.Pa. July 15, 1998) (quoting *Ellsworth Associates,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Inc. v. United States, 917 F.Supp. 841, 844 (D.D.C.1996)). The court expressly rejected the *Notaro* factors as inappropriate under such circumstances. *See id.* at *5 n. 1. In attempting to develop a standard, the court focused on the circumstances of the case: the pending preliminary injunction hearing, the need for discovery, and the breadth of the moving party's discovery requests. If narrowly tailored to fit the needs of the hearing, leave to conduct expedited discovery would be granted. Where the requests are overly broad, as they were in *Philadelphia Newspapers*, leave is denied.

FN1. *See, e.g., RDS Group Ltd. v. Davison*, No. 02-8168, 2003 LEXIS 1337 (E.D.Pa. Jan. 17, 2003) (granting expedited discovery for pending preliminary injunction hearing); *Educational Commission for Foreign School Medical Graduates v. Repik*, No. 99-1381, 1999 U.S. Dist. LEXIS 7185 (E.D.Pa. May 14, 1999); *BABN Technologies Corp. v. Bruno*, No. 98-3409, 1998 U.S. Dist. LEXIS 14802 (E.D.Pa. July 24, 1998) (same); *Philadelphia Newspaper, Inc. v. Gannett Satellite Information Network, Inc.*, No. 98- 2782, 1998 U.S. Dist. LEXIS 10511 (E.D.Pa. July 15, 1998) (same); *Energetics Sys. Corp. v. Advanced Cerametrics*, No. 95-7956, 1996 U.S. Dist. LEXIS 2830 (E.D.Pa. Mar. 5, 1996) (same); *see also Gucci*, at *17 (rejecting a lower standard because Gucci's discovery motion was *not* in aid of an impending preliminary injunction hearing).

The United States District Court for the Northern District of Illinois added to the standard set forth in *Philadelphia Newspapers*. In *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, the court commented that "it makes sense to examine the discovery request, as we have done, on the entirety of the record to date and the reasonableness of the request in light of all of the surrounding circumstances, similar to what was done in *Philadelphia Newspapers.*" 194 F.R.D. 618, 624 (N.D.Ill.2000). The court examined the appropriateness of expedited discovery by weighing the need for discovery at that point in the litigation with the breadth of the discovery requests, ultimately denying the requests as too broad for such an early stage of litigation.

A similar approach was employed by the United States District Court for the Northern District of California, even though no preliminary injunction hearing was pending. In *Semitool, Inc. v. Tokyo Electron America, Inc.*, the court developed a "good cause" standard akin to the inquiries made in *Merrill Lynch* and *Philadelphia Newspapers*. [FN2] *See* 208 F.R.D. 273, 275 (N.D.Cal.2002) (expressly rejecting *Notaro* under the circumstances, citing the "reasonableness" inquiries of *Merrill Lynch* and *Philadelphia Newspapers*); *see also Qwest Communication International, Inc. v. Worldquest Networks, Inc.*, 213 F.R.D. 418 (D.Colo.2003) (combining factors discussed in many cases to make "good cause" inquiry). The court used a balancing test, stating that "[g]ood cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Id.* at 276. The circumstances looked at by the court included how far in advance of the start of formal discovery was the motion made, how narrowly tailored are the discovery requests, what is the purpose of the plaintiff in requesting early discovery, do the requests burden the defendants, and whether the defendants are able to respond to the requests in an expedited manner. *See id.* at 276-78. The court concluded that the plaintiff's discovery was appropriate as to the requests made to the defendants, but inappropriate as to the requests made to third parties.

FN2. The "good cause" standard discussed in *Semitool* should not be confused with the Third Circuit's "good cause" standard used to decide motions for protective orders under Fed.R.Civ.P. 26(c). *See Glenmede Trust Co. v. Thompson*, 56 F.3d 476 (3d Cir.1995); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir.1994). Because of the possibility of confusion, the Court will refer to the expedited discovery standard as a "reasonableness" inquiry, rather than a "good cause" inquiry.

*4 Using the progression of reasoning developed in *Philadelphia Newspapers, Merrill Lynch*, and *Semitool*, the "reasonableness" inquiry emerges: a district court should decide a motion for expedited discovery "on the entirety of the record to date and the reasonableness of the request in light of all of the surrounding circumstances," unless the circumstances are such that the *Notaro* factors apply. *See Merrill Lynch*, 194 F.R.D. at 624. Whether or not a preliminary injunction hearing is pending, then, has become one factor to be evaluated among many, rather than an outcome determinative fact.

C. *Applicable Standard*

Defendants WDI argues that Plaintiff ETC's motion for expedited discovery should be analyzed under the *Notaro* factors because the discovery request is essentially the same relief asked for in Part IV of Plaintiff's complaint. Plaintiffs argue that the circumstances of this case are distinguishable from *Notaro* and that the motion for expedited discovery should be reviewed under a reasonableness analysis. As was stated above, the Court agrees with Plaintiffs as to which standard should apply.

The reasoning behind the *Notaro* and *Gucci* decisions was that the defendant non-moving party needed protection of the court from the plaintiff's extraordinary discovery

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

requests made extraordinarily early in the litigation process. The need for protecting the defendants from "unwarily incriminating themselves before they have a chance to review the facts of the case and to retain counsel," coupled with the substantive elements of plaintiffs' the discovery requests, resulted in the appropriateness of the preliminary injunction-like factors. *See* Notaro, 95 F.R.D. at 405.

In this case, Defendants are not in need of protection. Plaintiff filed the complaint on June 9, 2003, and the pending motion on August 18, 2003. Defendants have retained counsel and are themselves sophisticated corporations. The parties have enjoyed a long contractual relationship under the "Mission: Space" agreements. Parties have filed a complaint and an answer; Defendants have had time to review the facts of the case. Further, the Court can discern no *Gucci*-like circumstances indicating that Plaintiff ETC is using the litigation as a shell game for the sole purpose of discovering the requested documents. Therefore, the strict preliminary injunction test should not apply to this case.

The Defendant is correct to point out that the discovery requests do have an element of ultimate relief to them. Given the totality of the circumstances, however, that fact is better weighed against granting the Plaintiff's motion within the rubrik of an overall reasonableness test, rather than used to trigger the strictures of the *Notaro* test.

IV. *DISCUSSION*

When viewed in light of the totality of the circumstances, Plaintiff's expedited discovery request is not reasonable at this time and, accordingly, Plaintiff is denied leave to conduct early discovery.

*5 Weighing in favor of Plaintiff's motion is the fact that the discovery request has not been made too far in advance of the start of formal discovery. The parties have already received their status forms and the case should be calendared relatively soon. Further, the discovery requests are not as overbroad as the requests deemed overbroad in the *Philadelphia Newspapers* case. *See Philadelphia Newspapers*, at *7-8 (denying expedited discovery because requests for five depositions, a set of interrogatories, and requests for production of documents were "wholly overbroad" and burdensome to defendant). Plaintiff ETC seeks only the production of documents "concerning any testing and analysis of the safety, functioning or performance of the ride, including all components of the Ride." Plf.'s Expedited Document Request No. 1. To the extent that Plaintiff seeks documents from third parties at his early stage, the requests may be overbroad; *see* Semitool, 208 F.R.D. at 277-78 (granting expedited discovery as to requests made of opposing party, denying discovery as to requests pertaining to documents held by third parties); but they are not so overbroad that the Court can dismiss the motion based on that factor alone.

Further weighing in favor of granting the Plaintiff's motion is ETC's contention that it will suffer harm to its reputation if the discovery is not expedited. Irreparable harm is one factor to consider in deciding this motion. Weighing against the Plaintiff, however, is the fact that the harm to ETC's reputation that may result from this ruling is the same harm that may result from the contract action in its entirety. This underscores the point raised by Defendant WDI that what Plaintiff seeks in this expedited discovery motion is close to part of the ultimate relief sought by Plaintiff in its complaint.

There are a number of factors that weigh against, and ultimately lead the Court to deny, Plaintiff's motion. First, there is no pending preliminary injunction hearing for which the parties need to prepare, rendering the need to expedite discovery less urgent. Second, the Court is unconvinced by ETC's arguments that expedited discovery is necessary so that ETC can protect the public by reviewing WDI's testing data.

Third, and most importantly, the Court is unwilling to grant Plaintiff under this motion for expedited discovery what may amount to specific performance of part of the contested contract. Defendant points out that Plaintiff's request for relief in Count IV, paragraph 78(c) is very similar to the document requests made in this motion. [FN3] But the fact that Plaintiff may have inserted what amounts to a valid request for discoverable documents in its complaint is of little consequence to this analysis. What is of consequence is how Plaintiff plans to use the testing data if discovered. In its memorandum of law at page two, in support of expedited discovery, ETC states:

> FN3. In its Complaint, Plaintiff requests specific performance in the form of "an order directing Disney immediately to provide ETC with access to any safety or testing data relating to the Ride in Disney's possession, custody or control." Plf's Complaint; Count IV, para. 78.c.

> ETC needs to review the safety testing and analysis data as soon as possible to ensure that the public is not riding an unsafe entertainment ride. If ETC in fact discovers a problem in the safety testing data, it can quickly consult with Disney to try to correct any safety problems before more persons are exposed to danger.

*6 Thus, ETC wants the test data so it can participate in the safety evaluation of the Mission: Space attraction. That is precisely the specific performance ETC requests in its Complaint at Count IV, paragraph 78(a) and (b). The expedited discovery request at issue, then, goes to what may be ultimate issues in this case. That is, whether ETC has a

contractual right to perform the testing and whether WDI is qualified to perform the testing without ETC's expertise.

For these reasons, the factors against Plaintiff's motion weigh more heavily than those in favor of it. The Court is unconvinced that it should depart from the formal discovery process. Accordingly, Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis is denied.

Plaintiff's Motion to Shorten Time to Respond to Motion is denied as moot.

An appropriate Order follows.

*ORDER*

AND NOW, this 2nd day of October, 2003, upon consideration of Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis and to Shorten Time to Respond to Motion (Docket No. 12), and for the reasons set forth in the accompanying Memorandum, IT IS HEREBY ORDERED that:

(1) Plaintiff's Motion for Leave to Conduct Limited Discovery on an Expedited Basis is DENIED;

(2) Plaintiff's Motion to Shorten Time to Respond to Motion is DENIED AS MOOT.

2003 WL 22519440 (E.D.Pa.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**H**

United States District Court, S.D. New York.

BENHAM JEWELRY CORPORATION and J.D. Finesse, Inc. d/b/a/ Linea Aurea,
Plaintiffs,
v.
ARON BASHA CORPORATION, Defendant.
Aron Basha, Aron Basha Corporation, Counterclaimants
v.
Benham Jewelry Corporation, J.D. Finesse, Inc. d/b/a/ Linea Aurea, and
Katherine Tess Jewelry, Counterclaim Defendants

**No. 97 Civ. 3841(RWS).**

Oct. 14, 1997.

Levisohn, Lerner, Berger, and Langsam, New York City, by Thomas M. Furth, Peter L. Berger, Jane P. Linowitz, for plaintiff.

Gottlieb Rackman and Reisman, New York City, by George Gottleib, Amy B. Goldsmith, for defendant Aron Basha Corporation.

Tess Jewelry, Amster Rothstein and Ebenstein, New York City, Nancy Dodderidge, for counterclaim defendant Katherine.

SWEET, J.

*1 Defendants and counterclaim plaintiffs Aron Basha and Aron Basha Corporation ("Basha") have moved for a preliminary injunction precluding Plaintiffs Behnam Jewelry Corporation ("Behnam"), J.D. Finesse, Inc. d/b/a/ Linea Aurea ("Finesse"), and Katherine Tess Jewelry ("Tess") (collectively "Counterclaim Defendants") from manufacturing or selling certain baby shoe pendants ("baby shoe pendants" or "pendants") which infringe Basha's copyright. Basha has also moved for recall of any infringing baby shoe sold by the Counterclaim Defendants to their customers and for expedited discovery.

For the reasons set forth below, the motions are granted.

***Parties***

Basha is a corporation organized and existing under the laws of the State of New York with a place of business on 680 Madison Avenue, New York, New York. Basha is owned by Aron Basha, and is in the business of designing and marketing fine jewelry, both wholesale and retail.

Finesse is a corporation organized and existing under the laws of the State of New York, with offices at 576 Fifth Avenue, New York, New York. Finesse is a manufacturer and distributor of diamonds, gold and jewelry. Through the entity Linea Aurea, Finesse distributes jewelry to stores around the United States. Finesse is owned and run by Robert Etessami ("Robert Etessami" or "Robert"). Linea Aurea is managed by Robert Etessami's brother, Kevin Etessami, ("Kevin Etessami" or "Kevin").

Tess is a company with a principal office located at 11 Middlesex Road, Great Neck, New York 11021. Tess is owned and run by Katherine Tess Etessami, who is married to Robert Etessami.

Behnam is a corporation organized and existing under the laws of the State of New York, with offices at 23 West 47th Street, New York, New York 10036. Behnam is in the business of the manufacture and the distribution of jewelry at the wholesale level. Jerry Fox ("Fox") is Behnam's sales manager.

***Prior Proceedings***

On May 27, 1997, Behnam and Finesse filed a declaratory judgment action, seeking a determination that: (a) Basha's copyright registration of its baby shoe pendants was invalid; (b) Basha's pendant designs are merely variants of designs long available in the marketplace; (c) Behnam's baby shoe pendant were not copied from any of Basha's designs and were not substantially similar; (d) Finesse's baby shoe pendants were not copies of Basha's designs and were not substantially similar.

On May 28, 1997, Basha filed its answer to the declaratory judgment action, asserting counterclaims for violation of federal copyright and trademark laws, injury to business reputation and dilution of trademark under the New York General Business Law, and common law unfair competition. Also on May 28, 1997, Basha filed the instant motion for a preliminary injunction and temporary restraining order, precluding Behnam and Finesse from manufacturing, displaying or selling infringing baby shoe pendants. On May 29, 1997, this Court granted a three day temporary restraining order, preventing the defendants from displaying or selling any infringing baby shoe pendants at the JCK trade show in Las Vegas, held from May 28 to June 3, 1997.

*2 On June 16, 17, 18 and 19, the Court held an evidentiary hearing regarding the preliminary injunction. On June 24 and June 25, the Court received additional papers from Basha and Finesse, at which time the motion was considered fully submitted.

***Findings of Fact***

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*I. Basha's Acquisition of Rights in Baby Shoe Pendants Designed by Staurino Fratelli*

Basha has been in the jewelry business since 1959. He formed Aron Basha Corporation in 1991 to sell fine jewelry at the retail and wholesale levels. Basha's retail business is located on Madison Avenue in Manhattan. Since December 1996, Basha has held a license for the exclusive distribution of baby shoe pendants manufactured by Staurino Fratelli, an Italian jewelry design firm, and has owned the United States copyright for the pendants. At the wholesale level, Basha sells only Staurino Fratelli baby shoe pendants and accessories that complement the pendants. Basha also offers Staurino Fratelli baby shoe pendants for retail sale. The pendants are made from 18 karat gold, and 18 karat gold, and come in three basic shapes: (a) with a bow set on a band across the toe; (b) with a strap across the instep and a band across the toe; (c) with a strap across the instep and no band. The shoes are made of 14 karat gold or silver. Some are ornamented with french enamel in bright pastel colors and/or precious stones in various arrangements. The price of the pendants ranges from $900 to $3,600, depending on the number of diamonds set in the shoe, and the intricacy of the ornamentation.

The pendants were designed by Staurino Fratelli, an Italian firm in the business of the design, manufacture and wholesale of fine jewelry. The baby shoe pendants were first designed in April of 1994, after discussions of the concept between Luigi Staurino, David Staurino and a designer named Barbara Dragoni ("Dragoni"). Luigi Staurino instructed Dragoni to design baby shoe pendants in a specific shape, using bows or straps and colorful ornamentation. After Dragoni drafted the design, David Staurino created the first sample in plaster and then in wax. He spent two months adjusting the proportions of the original design as to length, width, and the use of a bow or strap, as well as ornamentation with precious stones and/or french enamel. Neither Dragoni nor David Staurino consulted actual baby shoes in designing the baby shoe charms.

Staurino Fratelli began marketing the baby shoe pendants in June 1994 at the Vicenza jewelry trade show in June 1994. [FN1] Subsequently, the baby shoes were prominently displayed in the window showcases at the Staurino Fratelli booth in all the major jewelry trade shows. Each of the baby shoe pendants are made according to the shapes and proportions established in the original model. Although the shoes are sold individually, Staurino Fratelli consistently advertises and displays the shoes in a group in order to create a strong impression of the design.

FN1. The major jewelry trade shows include: the Vicenza trade show, (the "Vicenza show"), which attracts a worldwide attendance and is held three times a year; the Valenza trade show, (the "Valenza show"), which occurs twice a year; the Basel trade show, (the "Basel show"), which attracts worldwide attendance and occurs once a year. (Collectively, the "major trade shows.")

*3 Staurino Fratelli advertised its baby shoes widely in the following magazines: Valenza Gioielli, an Italian trade magazine for jewelry, in March and April 1995, February, March and April 1996, and January 1997; Vogue Gioielli in December 1995, December 1996 and April 1997; and Vicenza Magazine in June 1996 and June 1997. These magazines are shipped to members to the jewelry trade, buyers coming to exhibitions and a number of shops around the world. Staurino Fratelli has spent approximately $100,000 on advertising.

As a result of their advertisements and trade show displays, Staurino Fratelli has received telephone orders from the United States, South America and the Far East. The first sales of Staurino Fratelli's baby shoe pendants were made to Japanese and British companies in August of 1994. Staurino Fratelli obtained a patent for their baby shoe pendant designs from the Italian Government on July 23, 1996. As a result of the number of pieces sold, the income accruing from these sales, and the amount of money invested in advertising, the baby shoe charms are now the most important product made by Staurino Fratelli.

Basha first saw Staurino Fratelli's baby shoes pendants at the Vicenza show in June 1995. Although Basha has attended the major jewelry trade shows since 1993, he had never noticed any other baby shoe pendants. Basha bought ten to fifteen baby shoe pendants from Staurino Fratelli for retail sale in his shop in 1995 and 500 pendants in 1996.

On December 23, 1996, Basha entered an agreement with Staurino Fratelli for the exclusive right to sell its baby shoe pendants in the United States. On December 26, 1996, Basha obtained copyright registration for the baby shoe pendants. The registration application stated that the registered work, entitled "It's Shoe Time", is a jewelry design authored by Staurino Fratelli first published in November of 1994. The application was accompanied by one of Basha's photographic advertisements depicting twelve different versions of Staurino Fratelli's baby-shoe pendant, six with bows and six with straps, and each ornamented differently with diamonds, french enamel or both. [FN2]

FN2. In detail, the pendants depicted in the deposit photograph may be described as follows: (a) four pendants in enamel-covered gold with straps and bands, and seven diamonds set on the toe; (b) four pendants in enamel-covered gold with a

diamond-covered bow set on a diamond-covered band across the toe; (c) two pendants, one in gold, one in silver, with a bow set on a band, entirely covered with precious stones; (d) one pendant made of silver with a strap, no band, and diamonds covering the toe only; (e) one pendant in enamel-covered gold with a diamond-covered strap across the instep, a band across the toe.

Basha displays the baby shoes prominently in the window of his Madison Avenue store. He has advertised the shoes in national magazines such as Manhattan File, Hampton magazine, Vogue Gioielli, W, Town and Country, and Parenting. Basha also mailed approximately 3,000 postcards to customers of American Express, displaying a photograph of the baby shoe pendants. The advertisements identify the pendants as baby shoes "designed exclusively for Aron Basha by Staurino Fratelli." Basha spent over $150,000 on advertising the pendants. In response to his advertisements, Basha has received numerous phone orders for the baby shoe pendants. So far in 1997, he has sold 1,200 to 1,500 pendants.

In early 1997, Basha became aware of baby shoe pendants offered for sale by Finesse d/b/a Linea Aurea, Tess and Behnam. Basha immediately instructed his counsel to send cease and desist letters to each of the alleged infringers. [FN3] The letter was sent to Tess on May 2, 1997, to Finesse on May 14, 1997, and to Behnam on May 13, 1997. On May 29, 1997 Basha obtained a temporary restraining order from this court, prohibiting Finesse, Tess and Behnam from displaying any infringing baby shoe pendants at the JCK Jewelry Trade Show which taking place in Las Vegas from May 28 to June 3, 1997, (the "Las Vegas show").

FN3. Basha sent an additional warning to other participants in the Las Vegas show, advising that Basha's baby shoe line of jewelry products was protected by copyright. Basha also placed an advertisement in National Jeweler magazine, which is distributed to the jewelry trade twice a month, warning against infringement of Basha's copyright in the "It's Shoe Time" line of baby shoe jewelry. The warning included the photograph of the baby shoes pendant which was deposited with the copyright registration.

*4 Once at the Las Vegas show, Basha inspected the Finesse d/b/a Linea Aurea booth to determine whether they were abiding by the temporary restraining order issued by this Court prohibiting display or sale of infringing baby shoe pendants. In the Linea Aurea display window, Basha saw six baby shoe pendants which were made of gold, with straps or bows and a band across the toe, covered with two colors of french enamel and set with diamonds. In short, the pendants closely resembled his own.

Basha also obtained an invoice from Behnam which indicated that, despite the restraining order, baby shoe pendants had been offered for sale and ordered by a customer.

*II. Infringement by Finesse d/b/a Linea Aurea*

Finesse and Linea Aurea appear to have copied Basha's pendants by importing baby shoe pendants from another Italian company which copied the Staurino Fratelli design, and by using the imported copies to manufacture its own pendants. [FN4]

FN4. Before relating the circumstances which establish this inference, it may be helpful to describe the two processes by which the imported baby shoe pendant could be copied.
In first process, called the "lost wax" process, the model maker uses the finished piece as a physical design, and sculpts a wax model, excluding any stones set in the finished piece. The wax model is given to a caster, who attaches the model to a tree, a wax rod that holds the model in place. Model and tree are placed within a steel cylinder which is set onto a rubber base, the tree fixed into a hole in the rubber base. The caster then pours plaster of paris, which is called the "investment", around the wax model and tree. After the plaster sets, the wax model and tree are burned out of the plaster, and silver is poured into the plaster. The investment is broken open, leaving a silver model of the pendant attached to a silver rod. The silver model is filed and cleaned. If the product is to be finely crafted, the caster will drill holes in the silver cast to allow stone settings to be soldered into it at a future point. If it is not to be a fine piece of work, the caster will drill holes in the silver casting and solder in settings so that the settings will become part of the next version of the model. The caster then makes a rubber mold of the silver model by placing raw rubber in a frame, and placing the silver model between the layers of rubber. The rubber is vulcanized and cut into two halves, which become the two halves of the mold. Molten wax is shot into the rubber mold, and the investment process is repeated. The resulting plaster mold can be used to cast the finished pieces in gold, brass or silver. The size of the copy will vary according to the skill of the model-maker in carving wax, and according to variables in the vulcanizing process.
The second method is called the "knock off" method. In this process any stones would be removed and the original pendant might also be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

silver- plated to add thickness for later filing and polishing of the copy. The original is then attached to a sprue, a rod, and placed within layers of raw rubber which is vulcanized. The lost wax process is then utilized to create a silver model and a plaster mold. The finished casts are filed and polished, and stones are set. The dimensions of the copy would be smaller than those of the original.

In 1996 Kevin Etessami imported five to ten baby shoe pendants manufactured by an Italian jewelry manufacturer, Mario Della Carbonare, also called MDC (the "MDC baby shoe pendants"), which had been found to be infringing copies of Staurino Fratelli's designs by a trade fair jury at the Vicenza show in June of 1996. The trade fair jury is an organization that polices the use of jewelry designs at trade shows. The jury found the MDC shoes to be infringing copies, and ordered MDC to remove the pieces from their exhibit and the show catalogue and to cease any sales of the pieces. David Staurino later learned that, although MDC had removed the baby shoes from their window display, they had continued to offer the shoes for sale. [FN5] In September of 1996, Finesse, through Linea Aurea, purchased these pendants from MDC and began to sell the imported MDC baby shoe pendants in the United States.

FN5. Staurino Fratelli sent MDC a warning letter dated July 4, 1996, directing MDC to cease production, exhibition or sales of its baby shoe jewelry, and, according to David Staurino, continues to pursue its claim against MDC in Italy.

The Etessamis also unsuccessfully attempted to import the actual Staurino Fratelli pendants. In January of 1997, Kevin Etessami visited the Staurino Fratelli booth at the Vicenza trade show with his sister-in-law Katherine Tess and expressed an interest in marketing the Staurino Fratelli baby shoe pendants in the United States. Etessami did not mention that he was already importing the MDC baby shoe pendants. David Staurino informed Etessami that the exclusive agreement with Aron Basha prevented Staurino Fratelli from selling the shoes to other American distributors. Etessami then remarked that he might distribute the shoes in the Far East and South America, and placed an order for four models. Katherine Tess also ordered some baby shoe pendants for her personal use. Two weeks later, Staurino Fratelli sent Etessami a letter declining to ship his order because it conflicted with agreements with other Staurino Fratelli distributors in the Far East, South America, as well as the agreement with Basha in the United States.

As regards the Etessamis manufacture of pendants in the United States, conflicting testimony was heard as to whether the Etessamis copied the MDC copy of Staurino Fratelli's design, or whether they used pendant designs which had been created independently of the Staurino Fratelli designs to manufacture their pendants.

*5 Robert Etessami testified that in late 1984, he had seen a photograph of a baby shoe pendant in Sotheby's catalogue, and asked a designer named Mario Archangel ("Archangel") to create a baby shoe pendant design of baby shoe pendants. Between 1984 and 1996, the resulting models were not used.

Archangel testified that he was approached by Robert Etessami in 1984 to design a baby shoe pendant based on a photograph in a Sotheby's catalogue. Archangel created thirteen drawings based on the Sotheby's photograph, and nine silver models based on the drawings. He gave the drawings and models to Robert Etessami in 1985. Archangel had no further conversations with Robert regarding baby shoes until the fall of 1996, when Robert called and told Archangel that Finesse had imported some baby shoe pendants from Italy and intended to produce pendants from the baby shoe models made in 1985.

Kevin and Robert Etessami testified that the Archangel models were used to manufacture Linea Aurea's pendants in 1996. However, the weight of testimony by both the Etessamis is lessened by their self-interest in proving independent creation of the pendants. Moreover, certain discrepancies in other parts of Kevin Etessami's testimony further weakened his credibility. [FN6]

FN6. For example, Kevin Etessami testified that he saw Basha's expert witness, Isaac Ainetchi, at the Las Vegas show with Basha. However, Ainetchi established that during the show he was not in Las Vegas.

Daniel Baez, the mold-maker employed by Kevin Etessami testified that he made baby shoe pendant molds for the Etessamis sometime before December, 1996. However, he could not positively identify the Archangel models as the basis for those molds. Baez also testified that one of the models from which molds were made for the Etessamis has been lost since February or March, 1997.

The pendants created from this missing model closely resemble one of the imported MDC pendants which in turn appear to be a copy of Staurino Fratelli's designs. Staurino Fratelli makes a gold pendant with a diamond-covered bow set on a diamond-covered band across the toe. The MDC pendant is made of gold, with a plain bow set on a diamond-covered band across the toe. The Linea Aurea pendant is made of gold, with a diamond-covered bow set on a diamond-covered band across the toe. All three pendants are very similar in their rounded proportions and size. The Linea Aurea pendant is very slightly smaller than the MDC pendant. The similarity between the MDC

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

pendant and the Linea Aurea pendant raises the inference that the Linea Aurea pendants were manufactured by copying the MDC pendant rather than using models made by Archangel.

According to testimony of an expert in the jewelry business, a credible and qualified witness, the Linea Aurea pendant was copied from the MDC pendant. The smaller size of the Linea Aurea pendant would result from the copying process, during which the copy of the baby shoe would lose 10 percent of its weight and mass.

The production of Linea Aurea's U.S. manufactured baby shoe pendants was completed sometime between August or September and December of 1996. Kevin Etessami first sold the U.S. manufactured pieces in December of 1996. He first displayed the pieces at a jewelry trade show in Orlando in early February of 1997. Etessami testified that he has sold approximately $100,000 worth of baby shoe pendants, both imported and U.S. made, between September 1996 and May 1997.

*6 In May 1997, the Etessamis published an advertisement for Linea Aurea jewelry in the brochure for the Las Vegas Show. The photograph in Linea Aurea's ad included two baby shoe pendants, one of which was the MDC pendant. On May 14, Finesse received a cease and desist letter from Basha. After issue of the temporary restraining order from this Court, Kevin Etessami removed the MDC shoes from his display at the Las Vegas show, but he continued to display the Linea Aurea made baby shoe pendants. As described above, the displayed pendants closely resembled those carried by Basha.

*III. Infringement by Katherine Tess Jewelry*

Tess sells accessories and jewelry in a business which she began in Great Neck Long Island two years ago. As set forth above, in January 1997, Tess visited the Staurino Fratelli both at the Vicenza show with her brother-in-law, Kevin Etessami. During the visit Tess attempted to purchase several Staurino Fratelli pendants as part of Kevin Etessami's larger order. However, when Kevin's order was canceled, Tess' order was also not filled.

In January or February of 1997, Tess saw one of Basha's promotional postcards depicting baby shoe pendants. In March or April 1997, Tess obtained 29 baby shoe pendants from Kevin Etessami and prepared a post card to advertise her own business. Kevin Etessami testified that eight of the shoes depicted in the postcard were made from Archangel models, and thirteen of the shoes were made from the model lost by the mold-maker, Daniel Baez. The remaining eight pendants were purchased from an Italian supplier, who was also the supplier of the MDC pendants.

Tess' postcard resembled Basha's in the arrangement of the pendants. Both postcards show a thick chain across the top linking the pendants. Both carry the name of the business in fancy script above the chain. Both display an array of other pendants below the chain, although Basha's pendants are linked by a fine gold chain and Tess' pendants are not. The cards are also approximately the same size, although Tess' is slightly narrower.

The individual pendants depicted in Tess' postcard, which she obtained from Linea Aurea, also resemble pendants depicted in Basha's postcard:

(a) sixteen of Tess' pendants are made of enamel-covered gold, with a diamond-covered bow and contrasting color on toe and heel; several of Basha's pendants meet that same description;
(b) three of Tess' pendants are made of enamel-covered gold, with a diamond- covered strap, and a gold band across the toe; several of Basha's pendants do as well;
(c) two of Tess' pendants have a diamond-covered strap and a plain gold or silver surface; none of the pendants in Basha's postcard meet that description, but Basha does carry such a pendant;

(d) three of Tess' pendants have a bow set on a band across the toe and are completely covered with diamonds, or are covered with diamonds on the bow and toe only; several of Basha's pendants have a bow set on a band and are completely covered with diamonds, although none are covered with diamonds on the bow and toe only.

*7 On May 2, 1997 Tess received a warning letter from Basha regarding infringement of his copyright in the baby shoe pendants and of his advertisement design. In response, Tess entered an agreement with Basha that she would no longer offer baby shoe pendants for sale.

*V. Behnam's Infringement*

Jerry Fox, the sales manager of Behnam jewelry responsible for developing a new baby shoe product for Behnam, testified that he first thought of marketing baby shoe pendants in 1996 as a result of a trend in baby jewelry. Fox had attended the Vicenza show in January of 1996 and the Basel show in April of 1996 at which Staurino Fratelli baby shoe pendants were prominently displayed. Behnam does not itself manufacture jewelry, but contracts with model makers and casters outside the firm. In September of 1996 Fox asked a designer named Christine Szeto to create baby shoe pendants, and gave her some sketches he had made. Fox's sketches were not presented into evidence and he did not know whether Szeto used the sketches or other sources to create her designs. Behnam did not make Szeto available for testimony. Moreover, there were several differences between the Szeto designs and some of the finished Behnam baby shoes. For example, one Szeto design depicted a metal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

bow and stones set around the opening of the baby shoe, but the corresponding finished Behnam pendant had stones set in the bow, but not at the opening. This latter arrangement of stones more closely resembles the Staurino Fratelli design than designs by Szeto. Finally, no testimony from the model-maker or caster of the maker of the Behnam shoes was offered which would establish the use of the Szeto designs.

Behnam's first sales of the baby shoes were to Macy's of California in November of 1996. All its shoes were made in 14 karat gold and the average retail selling prices of Behnam's shoes was about $199.

In April of 1997, Behnam sent a mailing of approximately 6,000 postcards depicting six of its baby shoe pendants. A comparison of the pendants in the Behnam postcard to those carried by Basha reveal a strong resemblance, as follows:

(a) two of Behnam's pendants are made of gold, with a bow set on a band across the toe, and diamonds covering both bow and band, one with an emerald set in the center of the bow; Basha offers a gold baby shoe pendant with a bow set on a band across the toe, with diamonds covering bow and band;

(b) two of Behnam's pendants are made of gold, with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe, four in a cluster on the right hand side, and three set in a triangle pattern on the left hand side; Basha offers a gold pendant with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe in the identical pattern, although Basha's pendant is also covered with french enamel in two colors;

(c) one of Behnam's pendants is made of gold, with a strap across the instep and diamonds covering the toe; Basha offers a gold pendant with a strap across the instep and diamonds covering the toe;

*8 (d) one of Behnam's pendants is made of gold, with a diamond-covered strap across the instep and a band on the toe; Basha offers a pendant made of gold with a diamond-covered strap across the instep, although there is no band on the toe.

Finally, Behnam's pendants are similarly proportioned and approximately the same size as those carried by Basha.

On May 13, 1997, Behnam received a cease and desist letter from Basha's attorneys, directing it to stop marketing its baby shoe pendants and to send all records to Basha's counsel. After learning of the temporary restraining order issued by this Court, Fox directed the Behnam staff at the Las Vegas show to remove display photographs and printed material regarding the shoes, and to remove the shoe pendants themselves from the showcase. However, an order form from Behnam dated June 1, 1997, the period of the Las Vegas show, lists six different types of baby shoe pendants which were ordered by one of Behnam's customers.

*VI. Affect of Infringement on Basha*

Basha had received numerous complaints from his customers and authorized retailers regarding the presence of "knock-offs" being sold in the marketplace at a lower price than Basha's baby shoe pendants. The baby shoe pendants marketed by Finesse, Tess and Behnam are manufactured with gold of lesser quality, fewer precious stones and their design is less intricate and detailed. Basha reports that consumers who are familiar with his baby shoes will believe that Basha has gone into the lower market business, and that the confusion and complaints caused by the alleged infringement has reduced his business by 30 percent. Several exclusive retailers have informed him that they will not market his baby shoe pendants if knock-offs are generally available in the marketplace.

*Conclusions of Law*

Basha has asserted his request for injunctive relief based on his counterclaim for copyright infringement and has not pressed or briefed his claims for trade dress infringement, dilution or unfair competition. Injunctive relief against a putative infringer should be granted when the moving party shows: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in plaintiff's favor; and (2) likelihood of irreparable injury. Richard Feiner and Company, Inc. v. Turner Entertainment Co., MGM/UAU, 98 F.3d 33, 34 (2d Cir.1996); Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp., 25 F.3d 119, 122 (2d Cir.1994); Topps Company, Inc. v. Gerrit J. Verburg Co., No. 96 Civ. 7302, 1996 WL 719381 (S.D.N.Y. Dec.13, 1996).

***I. Basha has Demonstrated Likelihood of Success in His Infringement Claim***

In order to establish a claim for copyright infringement, a plaintiff must show ownership of a valid copyright and the defendant's infringement by unauthorized copying. Knitwaves, Inc. v. Lollytogs Ltd. (Inc.), 71 F.3d 996, 1002 (2d Cir.1995); Fisher-Price, 25 F.3d at 122-23; Laureyssens v. Idea Group, Inc., 964 F.2d 131, 139 (2d Cir.1992); Rogers v. Koons, 960 F.2d 301, 306 (2d Cir.1992). To prove infringement, a plaintiff must demonstrate that (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's. Fisher- Price, 25 F.3d at 122-23; Laureyssens, 964 F.2d at 140.

***A. Basha's Copyright is Valid and Basha has Standing to Bring an Infringement Action as to All Staurino Fratelli***

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*Pendants*

*9 Apart from certain exceptions not applicable here, a copyright claimant must obtain a registration from the United States before bringing suit for copyright infringement. 17 U.S.C.A. § 411 (West 1996); *Pristine Industries, Inc. v. Hallmark Cards, Inc.*, 753 F.Supp. 140, 148 (S.D.N.Y.1990) (valid federal copyright registration is a necessary element of infringement action).

Basha obtained a single registration for the baby-shoe pendants. The application stated that the work is a jewelry design entitled "It's Shoe Time", authored by Staurino Fratelli and first published in November of 1994. The application was accompanied by a photograph depicting twelve different baby shoe pendants.

The Copyright statute permits registration of multiple related works under a single copyright application. [FN7] 17 U.S.C.A. § 408(c) (West 1996). Single registration of multiple works was established in the 1976 amendment to § 408(c) in order to encourage authors to seek copyright registration. The House Report to the 1976 amendment states:

> FN7. The section states in relevant part: The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulations may require or permit, for particular classes, ... a single registration for a group of related works. 17 U.S.C.A. § 408(c)(1) (West 1996).

> The provision empowering the Register to allow a number of related works to be registered together as a group represents a needed and important liberalization of the law now in effect. At present the requirement for separate registrations where related works or parts of a work are published separately has created administrative problems and has resulted in unnecessary burdens and expenses on authors and other copyright owners. In a number of cases the technical necessity for separate applications and fees has caused copyright owners to forego copyright altogether. Examples of cases where these undesirable and unnecessary results could be avoided by allowing a single registration include ... *a group of related jewelry designs* ...

House Report on the 1976 Amendment of the Copyright Act, H.R.Rep. No. 1476, 94th Cong., 1st Sess. (1976) *reprinted in* 17 U.S.C.A. § 408 at 466 (West 1996) (emphasis added). The regulation governing single registration, set forth at 37 C.F.R. § 202.3, states in relevant part:

> (i) *Registration as a single work.* (1) For the purpose of registration on a single application and upon payment of a single registration fee, the following shall be considered a single work: (A) in the case of published works: All copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same ...

37 C.F.R. § 202.3(b)(3)(i)(A) (1996).

The Counterclaim Defendants assert that, because the baby shoe pendants are sold separately, they are not eligible for registration as a single work. They cite two cases in support of this position: *Tabra Inc. v. Treasured Paradise Designs, Inc.*, 15 U.S.P.Q.2d 1234 (N.D.Cal.1990) and *Bruce & Company v. B.H. MultiCom. Corp.*, ---F.Supp.---- No. 96 Civ. 8083, 964 F.Supp. 265, 1997 WL 277998 (N.D.Ill. May 15, 1997). However, both cases turn on the question of relatedness of design rather than any evidence that the designs at issue were sold as a single unit.

*10 In *Tabra*, the plaintiff's copyright was found invalid because the jewelry designs were not related works; the issue of publication as a "single unit" was not even raised. The plaintiff in *Tabra* included 250 jewelry designs in six separate copyright registrations, grouped by year only, without any attempt to connect the jewelry by distinguishing characteristics. The court found that the jewelry pieces covered by each of these registrations were a "conglomeration of designs" not necessarily bear any resemblance to each other: "The only apparent relationship is that many pieces are earrings and have a primitive look." *Tabra*, 15 U.S.P.Q.2d at 1237. In contrast, Basha registered twelve closely related designs in its single application. All the pieces are baby shoe pendants shaped according to the specific dimensions created by Staurino Fratelli.

In *Black*, the defendant moved for summary judgment on the grounds that the plaintiff had defectively registered a group of unrelated rings in a single application. The Court agreed that the identifying materials submitted with the registration depicted "a conglomeration of ring designs which bear no resemblance to each other." *Black*, 964 F.Supp. 265, 1997 WL 277998 at *4. The plaintiff countered that the relatedness requirement set forth in 17 U.S.C. § 408(c) was satisfied because "the works are included in a 'single unit of publication' ... [where] the rings are offered for sale together as a line and appear together in their marketing material ..." The court found that "[w] hether the rings are sold separately or together as a line and whether that is sufficient" presented an issue of material fact, and denied summary judgment. *Id.* The court's reasoning in *Black* does not establish that group sale is a condition precedent for single registration of related works. Rather, the court considered without deciding whether

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

"single unit of publication" would be an adequate proxy for the relatedness requirement of § 408(c). *Id.*

One other case has addressed the validity of a single registration for multiple related works. In *Original Appalachian Artworks v. Toy Loft,* 489 F.Supp. 174 (N.D.Ga.1980), *aff'd,* 684 F.2d 821 (11th Cir.1982), the plaintiff brought an infringement action regarding a group of soft sculpture dolls registered under the title "The Little People". Like Basha's baby-shoe pendants, the assorted dolls were variations on the same basic design. Although they were sold individually, the dolls were marketed as a single line. The plaintiff corporation would ship its dolls with written information suggesting the manner in which the dolls should be displayed and sold. The court found that the single registration number established a valid copyright for all of the plaintiff's doll designs:

> The court has ... concluded that the defendants have infringed plaintiff's copyright ... In reaching this conclusion, the court notes that the plaintiff's copyright registration number VA 35-804 is sufficient to cover all of the differently-styled "Little People" that the plaintiff is presently manufacturing. *See* 37 C.F.R. 202.3(b)(3).

*11 *Id.* at 180.

Like the dolls in *Original Appalachian,* Basha's baby shoe pendants are marketed as a single line. Basha consistently displays the pendants in a group in his shop window and advertisements. The pendants are variations on the same basic design; they are related by size, shape, proportion, use of bows or straps, and ornamentation with diamonds or french enamel. Thus, the pendants satisfy the relatedness requirement of § 408(c), and, as in *Original Appalachian,* this relatedness in appearance permits single registration of multiple works.

This conclusion comports with the purpose of § 408(c), which has been "consistently described as a 'permissive' registration provision". Jane C. Ginsburg, *Copyright for the Nineties,* (4th ed.1993) at 381. The language and legislative history of the statute indicates that the only requirement for single registration of multiple works is "relatedness." There is no evidence in legislative history or case law that the "published in a single unit" language in 37 C.F.R. § 202.3 is meant to constitute an additional condition precedent to valid registration. [FN8] In fact, this conclusion is contradicted by the House Report on the 1976 amendment of 17 U.S.C. § 408(c), which explicitly states that the purpose of the amended section is to eliminate the "requirement of separate registrations where related works ... are published separately", thereby encouraging registration of such works as related jewelry designs. H.R.Rep. No. 1476 *reprinted in* 17 U.S.C.A. § 408 at 466. If the works satisfy the requirement of relatedness, as in the case of the Basha's baby-shoe pendants, an additional requirement that the works also be "published in a single unit" would undermine the purpose of the statute.

> FN8. The regulatory language appears to have been drafted in order to protect copyrightable elements included in multi-media works, such as movies and computer games. *See* 2 Melville B. Nimmer, *Nimmer on Copyright,* § 7.18[C][3] (1994) & n. 26 (noting that certain courts have "accorded too much weight to the formality of registration").

Counterclaim defendants also contend that not all of Basha's pendants are covered by the copyright, because the photograph which Basha appended to his application only included twelve versions of the shoe. A copyright registrant is required to submit two complete copies of the best edition of the work within three months after the date of such publication. 17 U.S.C.A. § 407(a) (West 1996):

> The requirement of *complete* copies ... means that the copies as deposited must be fully as complete in all elements ... as were the copies theretofore published. Thus if only a ... portion of the published work is deposited (such as the first of several published chapters) this will not comply with the statutory requirement of complete copies.

2 *Nimmer,* § 7.17[E][2][a] at 7-183 (1991) (emphasis in original). [FN9]

> FN9. If the work is unwieldy, the registrant may deposit identifying material instead of copies. *Id.* § 408(c); House Report 1476 *reprinted in* 17 U.S.C.A. § 408 at 466; 2 *Nimmer,* § 7.17[E][2][e].

Failure to deposit a complete copy of the work does not forfeit copyright protection, but it is a prerequisite for bringing an infringement action. *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 453 (2d Cir.1989); *Fonar Corporation v. Magnetic Resonance Plus, Inc.,* 920 F.Supp. 580, 513 (S.D.N.Y.1996). However, errors contained in copyright registration, if committed without deceptive intent, are harmless and do not invalidate the copyright. *Thomas Wilson & Co. v. Irving J. Dorfman, Co.,* 433 F.2d 409, 412 (2d Cir.1970) (failure of second copyright application to refer to first, while "potentially more serious", would not bar copyright protection because made innocently); *Gund, Inc. v. Swank, Inc.,* 673 F.Supp. 1233, 1237 (S.D.N.Y.1987) (error in date of creation and failure to refer to stuffed lion as derivative work not fatal to standing to bring action); *Data General Corp. v. Grumman Systems Support Corp.,* 825 F.Supp. 340 (D.Mass.1993) (several clerical errors in deposit copy of software program not fatal to standing to bring action); *See also* 2 *Nimmer,* § 7:20 (discussing long history of courts permitting plaintiff to bring infringement action where errors in registration were unaccompanied by fraud.) Thus, Basha's copyright in the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

pendants omitted from the deposit photograph is valid, and because there is no evidence that Basha submitted the photograph with an intent to deceive, his standing to bring this action is intact as to all pendants.

***B. Evidence of Actual Copying***

***12** A plaintiff in a copyright infringement action may prove actual copying either by direct evidence, or by indirect evidence showing the defendant's access to the copyrighted work and similarities that are probative of copying between the works termed "probative similarity". Fisher-Price, 25 F.3d at 123; Laureyssens, 964 F.2d at 140.

Access is established either by demonstrating that (1) the infringed work has been widely disseminated, or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted work. Repp v. Webber, 892 F.Supp. 552, 556-57 (S.D.N.Y.1995). The term "probative similarity" is used to distinguish the analysis used to determine whether copying occurred from the substantial similarity analysis used to determine whether that copying constitutes infringement.

Probative similarity analysis requires consideration of the entire work, while substantial similarity analysis requires comparison only of the protected features. Fisher-Price, 25 F.3d at 123 (citing Alan Latman, *Probative Similarity as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement*, 90 Colum.L.Rev. 1187, 1214 (1990)); *Kurt S. Adler, Inc. v. World Bazaars, Inc.*, 897 F.Supp. 92, 93 (S.D.N.Y.1995); *Tienshan, Inc. v. C.C.A. International*, 895 F.Supp. 651, 656 (S.D.N.Y.1995); 3 *Nimmer*, § 13.03 [[A], at 13-29 (1996).

***1. Actual Copying by Finesse***

As to one particular gold and diamond bowed pendant, direct evidence was presented that Finesse d/b/a Linea Aurea copied Staurino Fratelli's design. The Etessamis acknowledged importing baby shoe pendants manufactured by MDC in Italy, which a jewelry trade show jury had found to be copies of Staurino Fratelli's design. After importing MDC pendants, Linea Aurea themselves manufactured baby shoe pendants. Although the Etessamis maintained that they had used models created in 1985 by the designer Archangel to manufacture their pendants, they had lost the model used to create one particular line of pendants and their mold-maker could not recall whether he had used the Archangel model to manufacture those pendants. Comparison of the Linea Aurea pendant made from this missing model and an MDC pendant reveals an almost identical appearance; both are made of gold, with a diamond-covered bow set on a band across the toe, and are similarly proportioned, although the Linea Aurea shoe is very slightly smaller than the MDC shoe. Both of these pendants are almost identical to one made by Staurino Fratelli. A reliable expert witness testified that the Linea Aurea gold pendant was copied from the MDC pendant, which would result in a slightly smaller size.

As to the rest of Linea Aurea's pendants, indirect evidence of copying by Linea Aurea was provided by a demonstration of access and probative similarity. Linea Aurea had access to the baby shoe pendants both in Europe and the United States. Since 1994 Staurino Fratelli has displayed its baby shoe pendants at all the major European trade shows, as well as in extensive advertising in European and specifically Italian jewelry trade magazines. Both Etessamis attended several of the European shows. The Etessamis also receive the trade magazines cayrrying Staurino Fratelli's advertisements. [FN10] Kevin Etessami visited the Staurino Fratelli Booth at the Vicenza show in January 1997 and ordered several baby shoes. The Etessamis also had access to the baby shoe pendants in the United States through Basha's displays at trade shows and advertisements in various magazines and postcards. This evidence supports a determination that the Etessamis had access to the Staurino Fratelli designs. *See Kurt S. Adler*, 897 F.Supp. at 93-94 (finding access established by the display at two trade shows attended by defendant).

> FN10. Although Robert Etessami denied having seen any ads for Staurino Fratelli baby shoe pendants, his testimony carries less weight because he is a self-interested witness.

***13** Probative similarity has been established between Basha's pendants and those produced by Linea Aurea as follows:

(a) one of Basha's pendants is a gold shoe with a diamond-covered bow set on a diamond-covered band across the toe. Linea Aurea imported a pendant made by MDC which is gold, with a diamond-covered bow set on a plain band across the toe. Linea Aurea also manufactured a gold shoe pendant with a diamond-covered bow set on a diamond-covered band across the toe. Both the imported MDC pendant and Linea Aurea manufactured pendant are similar in proportion to the Basha pendant, albeit slightly smaller in size. The MDC pendant carries its trademark inside on the sole of the shoe. The Linea Aurea manufactured pendant carries a mark designating its gold content also inside on the sole. The Basha shoe also has a trademark stamped inside on the sole of the shoe, albeit slightly closer to the heel;

(b) one of Basha's pendants is made of enamel-covered gold and has a diamond- covered bow set on a diamond-covered band running across the toe. The toe of the shoe is covered in red french enamel, and black enamel covers the sides and back. A trademark is stamped on the inside sole of the shoe

towards the heel. The Linea Aurea pendant is also made of enamel-covered gold. The bow is white french enamel, with a diamond set on the center knot. The toe of the shoe is covered in red french enamel and dark blue enamel covers the sides and back. There is no markstamped inside the shoe.

(c) one of Basha's pendants is made of plain gold with a diamond-covered strap across the instep. There is no band or ornamentation on the toe. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of gold with a diamond-covered strap across the instep. There is a plain gold band across the toe. There is no trademark stamped on the inside sole.

(d) one of Basha's pendants is made of enamel-covered gold and has a diamond- covered strap across the instep and a gold band across the toe. Black enamel covers the toe, and white covers the sides and back. There is a trademark stamped on the inside sole near the heel. The Linea Aurea pendant is made of enamel-covered gold with a silver strap across the instep and blue enamel on the toe, sides and back. There is a trademark stamped on the inside sole near the heel.

In general, the Linea Aurea pendants are similarly proportioned as the Basha pendants, and follow two of the three basic variations established in Staurino Fratelli's designs, either bow set on a band across the toe, or strap across the instep with a band across the toe. Besides the differences noted above, the Linea Aurea pendants are smaller in size. However, the sum of the many similarities is sufficiently probative to conclude that Linea Aurea actually copied its pendants.

Linea Aurea attempts to rebut Basha's prima facie case of actual copying by asserting that its pendants were made from designs independently created by Archangel in 1984. "If the plaintiff meets its burden of establishing access and similarity, the defendant must then come forward with credible evidence of independent creation to negative the inference of copying." Arrow Novelty Company Inc. v. ENCO National Corp., 393 F.Supp. 157, 160 (S.D.N.Y.1974) *aff'd* 515 F.2d 504 (2d Cir.1975). However, "even with such evidence from the defendant, there may be such substantial similarity that no other explanation other than copying is reasonably possible." Novelty Textile Mills Inc. v. Joan Fabrics Corp., 558 F.2d 1090, 1092 n. 2 (2d Cir.1977); Imperial Textile Co. of New York, Inc. v. Amitex Fabrics Inc., 682 F.Supp. 18, 19 (S.D.N.Y.1987); Arrow Novelty, 393 F.Supp. at 160, 3 *Nimmer*, § 13.01[B] at 13-13.

*14 In *Imperial Textile*, the defendant presented several witnesses who testified that it had independently created its fabric design, which contained the same pattern and colors as the plaintiffs most successful design. The court accepted the defendant's contention that the source of its pattern came from in-house fabrics the defendant already had on hand, but rejected the defendant's conception that the spacing concept, size, selection of colors and arrangement of the pattern were the result of independent creation. The court based its rejection on strong evidence of access and a similarity so close that "to conclude otherwise would be to find coincidence that defies belief." Imperial Textile, 682 F.Supp. at 19. The facts in the instant case are similar. While the Etessamis may have used Archangel's models for the basic slipper used in the baby shoe pendants, the ornamentation with french enamel in bright colors, and diamonds arranged on bow or strap, are too similar to the design choices made by Staurino Fratelli to be mere coincidence. The Etessamis did not decide to use Archangel's models until after Kevin Etessami began importing the MDC copies of Staurino Fratelli's design. Moreover, the Etessamis have never produced those of Archangel's designs which differ from the Staurino Fratelli designs, such as a bootie version, a slipper without a strap or bow, and a slipper with a bow on the side of the strap. This chain of circumstances weakens the Etessamis assertions of independent creation, and re-establishes the conclusion that Linea Aurea's pendants were created to imitate Staurino Fratelli's designs.

*2. Actual Copying by Tess*

Copying by Tess was established by indirect evidence of access and probative similarity. Evidence of access included Tess' visit to the Staurino Fratelli booth at the Vicenza show in January 1997 with her brother in law Kevin Etessami, when she attempted to order Staurino Fratelli baby shoe pendants at that time. Also, Tess admitted seeing Basha's promotional postcard sometime in January or February 1997. It is also probable that Tess would have seen Basha's advertisements in various magazines.

In March or April 1997, Tess produced a promotional postcard that resembled Basha's both in design and in the individual shoes depicted. She obtained baby shoe pendants from Kevin Etessami and arranged them within the photograph in a chain across the top of the picture, as Basha had done in his postcard. She inserted her business' name above the chain in fancy script similar to that used by Basha. Tess' postcard is almost identical in size and shape to Basha's. While the shoes in the bottom half of Tess' postcard are loosely grouped, rather than linked by a fine gold chain as in Basha's, this difference does not outweigh the similarity between Tess' other design decisions and the choices used by Basha. Moreover, 21 of the 28 pendants in Tess' postcard were manufactured by Linea Aurea, and these pendants closely resembled Basha's.

*3. Actual Copying by Behnam*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*15 Copying by **Behnam** was also established by indirect evidence. Behnam obtained access to Basha's pendants when Fox attended the Vicenza show in January 1996 and the Basel show in April 1996 and read the catalogues produced for those trade fairs. While Fox denied reading some of the magazines in which the Basha pendants were advertised, he acknowledged that it was his job to keep abreast of trends in the jewelry trade. Given the pervasive advertising of the pendants by both Basha in the United States and Staurino Fratelli in Europe, it is unlikely that Fox could have failed to note their designs. Finally, Behnam used six pendants for a promotional mailing which closely resembled Basha's shoes. Because not all of Behnam's pendants are similar to those of Basha, the choice of those which most closely resemble the Staurino Fratelli designs raises the inference that Behnam had access to Basha's ads and was attempting to benefit from the popularity of his pendants.

As detailed above, probative similarity has been established between the six Behnam pendants depicted in the post card and Basha's pendants, as follows:

(a) several of Basha's pendants are made of enamel-covered gold with a diamond-covered strap across the instep, contrasting colors of enamel on toe and back, and seven diamonds set in the enamel on its toe, four in a cluster on the right and three scattered on the left. Behnam has two pendant with a diamond-covered strap across the instep and diamonds arranged in an identical manner to the stones on Basha's pendants, although Behnam's pendants are not coated with enamel, and one is silver rather than gold;

(b) one of Basha's pendants is made of gold with a diamond-covered bow set on a diamond-covered band across the toe. Behnam has two gold pendants with a diamond-covered bow, although there is no band across the toe, and one of the pendants has a colored stone set in the center knot of the bow;

(c) one of Basha's pendants is made of gold, with a plain strap across the instep and diamonds covering the toe only. Behnam also carries a gold pendant with a plain strap across the instep and a diamond-covered toe;

(d) one of Basha's pendants is gold with a diamond-covered strap across the instep and no decoration on the toe. Behnam carries a pendant made of gold with a diamond-covered strap and a plain gold band across the toe.

Finally, both Basha's and these six of Behnam's pendants are similar in their rounded proportions, although the Behnam pendants are slightly smaller and have a circular opening rather than an oval opening, as in the Basha pendants. This evidence of access and similarity leads to a conclusion that the six shoes depicted in Behnam's postcard were copied from Staurino Fratelli's design. [FN11]

FN11. The other 42 Behnam pendants differ from Basha's because of their smaller size, different ornamentation or both.

Behnam attempts to rebut this conclusion with the defense of independent creation, but its evidence is unpersuasive. Behnam did not offer testimony by the designer, "the one person who knows first hand whether [the pendants] were copied." *Tienshan, 895 F.Supp. At 658.* Behnam's witness, Fox, testified that he provided sketches of baby shoes to a designer, but could not assert from first hand knowledge that the designer had used only his sketches when preparing her drawings. The details of Behnam's pendants differed from the details in the designer's drawings, but resembled the details in Staurino Fratelli's pieces. As set forth above, Fox had ample opportunity to observe the Staurino Fratelli pendants at trade shows and in Basha's advertisements. It is not unlikely that his designer, also a member of the jewelry trade, would have had equal access to Staurino Fratelli's designs.

### *C. Substantial Similarity*

*16 Once actual copying is established, Basha must show that "the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works." *Laureyssens, 964 F.2d at 140.* Analysis of substantial similarity requires a "sharper focus" than that of probative similarity, for it includes only the protectible elements of the two works. *Fisher Price, 25 F.3d at 123.* "That is, the plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea." This determination is not an exact science. *Id.*

In most cases the test for substantial similarity is the "ordinary observer test", which determines whether an ordinary lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. *Knitwaves, 71 F.3d at 1002* (citing *Folio Impressions, 937 F.2d at 766*); *Laureyssens, 964 F.2d at 141* (citing *Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487, 489 (2d Cir.1960)* (L.Hand., J.)). Where, as here, the works contain both protected and unprotected elements, the Second Circuit applies the "discerning ordinary observer test", which examines similarity between the protectible elements of the plaintiff's work and the copy. *Knitwaves, 71 F.3d at 1002; Fisher-Price, 25 F.3d at 123; Laureyssens, 964 F.2d at 141; Tienshan, 895 F.Supp. at 657.* However, the Second Circuit cautions that in applying the more discerning inquiry, district courts should compare "the works' total concept and feel." *Knitwaves, 71 F.3d at 1003,* (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co., 499*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

U.S. 340, 358, 362, 111 S.Ct. 1282, 113 L.Ed.2d 358).

There is a tension between the discerning ordinary observer test, which requires extraction and comparison only of protectible elements, and the *Knitwaves* court's direction that a determination of substantial similarity should rely on the work's "total concept and feel." *See* M.H. Segan Limited Partnership v. Hasbro, Inc., 924 F.Supp. 512, 520 (S.D.N.Y.1996) ("Although the [more discerning ordinary observer test] requires that the Court exclude unprotectible ideas ... it must examine the 'total concept and feel' of the executed works.") At the root of these conflicting values is a concern that extraction of protectible elements would eliminate protection for works which are an original compilation of unprotected elements which, as the Supreme Court made clear, should be included under the aegis of the copyright statute. Feist, 499 U.S. at 358. As the *Knitwaves* court observed, if extracting only protectible elements was taken to its logical conclusion, "[courts] might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past." Knitwaves, 71 F.3d at 1003. To avoid this extreme, this Court must strike a balance between extraction of protected elements and consideration of overall look and feel when applying the discerning ordinary observer test:

> *17 Through *Knitwaves*, the Second Circuit has recently reconfirmed that the more discerning ordinary observer test is not an invitation to dissect a work into its constituent elements or features. The works as a whole must be compared to each other.

M.H. Segan, 924 F.Supp. at 521.

The question of substantial similarity is largely answered by the comparison conducted in the probative similarity analysis. Tienshan, 895 F.Supp. at 658. However, it is necessary to identify the protectible elements of Basha's pendants. *Id.* Staurino Fratelli created three basic designs of baby shoe pendant: one with a bow set on a band running across the toe; one with a strap across the instep and a band running across the toe; one with a strap and no band across the toe. The proportions of the shoe were specifically adjusted to be round, even bulbous, with an ovoid opening to the shoe, creating an overall look of chubbiness. Protectible elements are found in Staurino Fratelli's different arrangements of the ornamentation with french enamel and diamonds, such as the setting of diamonds on strap or bow and band, the use of contrasting colors of french enamel on toe and sides, and the pattern of the seven stones on the toe. *See.* Knitwaves, 71 F.3d 1004 (finding selection of leaves and squirrels as dominant design elements, fall palette of colors, and arrangement of elements into pattern to be protectible); Tienshan, 895 F.Supp. at 658-59 (finding placement on box of text, trademark, logo and photographs of actual plates and bowls to be protectible); Saban Entertainment, Inc. v. 222 World Corp., 865 F.Supp. 1047, 1051 (S.D.N.Y.1994) (features in Power Ranger cartoon characters rarely found in combination distinguish them from generic masked heroic figures).

As set forth above, comparison of Linea Aurea's pendants to those sold by Basha reveals a close resemblance in protected features as well as overall look and feel. The shoes are almost identical in size and shape. Linea Aurea's shoes also incorporate two of the three basic variations established by Staurino Fratelli. Linea Aurea's shoes are ornamented similarly to those carried by Basha, for example, Linea Aurea coats its shoes with french enamel and insets diamonds on the band and strap. Even the choice of colors for the enamel is similar. While the Linea Aurea shoes are slightly smaller, they closely resemble Basha's pendants in their rounded proportions. In sum, sufficient similarities exist in both protectible elements and in the "total concept and feel" that a discerning observer would conclude that one was the copy of another.

As set forth above, comparison of Behnam's line of pendants to the Basha pendants reveals substantial similarity in six of Behnam's 48 pendants. These include the two pendants with the seven stones arranged on the toe, the two pendants with diamond-covered bows on the toe, the pendant with a plain strap across the instep and diamonds covering the toe, and the pendant with the diamond-covered strap across the instep.

***D. Merger Defense: Idea/Expression***

*18 Both Linea Aurea and Behnam contend that Staurino Fratelli's expression of baby shoes is merged with the idea of baby shoes, and is therefore unprotectible, and that the similarities between their pendants and those of Basha/Staurino Fratelli are common to any execution of the idea of baby shoes. Citing Herbert Rosenthal Jewelry Corporation v. Kalpakian, 446 F.2d 738 (9th Cir.1971). In *Rosenthal,* the court ruled that despite evidence of actual copying and substantial similarity between the jeweled bee pins created by plaintiff and defendant, no infringement had occurred, because "the idea and its expression appear to be indistinguishable" and the similarities observed were "inevitable from the use of jewel-encrusted bee forms in both." *Id.* at 742. According to this doctrine, "[t]he idea and expression will coincide when the expression provides nothing new or additional over the idea," Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation, 562 F.2d 1157, 1168 (2d Cir.1977), however, "[t]he complexity and artistry of the expression of an idea will separate it from even the most banal idea." *Id.*

While there is no dispute that the simple idea of baby shoe pendant is unprotectible, "from an artistic standpoint, there is, indeed, a virtually infinite variety of ways to express the idea of [baby shoes]." Kurt S. Adler, 897 F.Supp. at 95. In

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the instant case, Staurino Fratelli has designed a version of a baby shoe pendant which is more complex and artistic than the banal idea of baby shoe pendants. David Staurino testified that he spent two months adjusting the exact size, style and proportions of the pendant. He then designed several specific ornamentations of the shoe, using diamonds, french enamel, gold and silver. These specific choices as to size, shape, proportion, and ornamentation constitute an artistic expression of a baby shoe pendant beyond its stereotypical features. In sum, the Staurino Fratelli pendants contain far more than the "dash of originality" needed to provide copyright protection. Tienshan, 895 F.Supp. at 658 (citing Rogers, 960 F.2d at 307).

Moreover, the Counterclaim Defendants' own evidence undercuts their claims of idea/expression merger. First, Defendants produced an actual baby shoe and a silver baby shoe ornament to establish that Staurino Fratelli merely used the basic idea of a baby shoe, but, in fact, the shoe and ornament differed in design from the pendants made by Staurino Fratelli: both sported both strap and bow; neither included a band across the toe. Second, the drawings by the defendants' own designers contained variations on a baby shoe which do not appear in Staurino Fratelli's designs, such as a bootie, a sneaker, a slipper without bow or strap, and a strapped instep with a bow on the side. In light of these many alternative versions of baby shoe design, the Counterclaim Defendants merger defense must fail.

*19 For the reasons set forth above, Basha has demonstrated a likelihood of success on the merits in its claim of copyright infringement.

***II. Irreparable Harm***

Where a plaintiff makes out a prima facie case of copyright infringement, irreparable injury can be presumed. Fisher-Price, 25 F.3d at 123; *Kurt S. Adler*, 897 F.Supp. at 96; *Tienshan*, 895 F.Supp. at 659; *Golden Bear*, 27 U.S.P.Q.2d at 1552. As explained by the Second Circuit:

> [T]his is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways ... confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Furthermore, if an infringer's product is of poor quality, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

Fisher-Price, 25 F.3d at 124 (internal quotations and ellipses omitted). Basha presented testimony to support this presumption; customers and authorized retailers have complained about the presence of "knock-off" versions being sold in the marketplace at a lower price, and several exclusive retailers have informed him that they will not market his baby shoe pendants if the presence of knock-offs continues. Linea Aurea, Tess and Behnam have not presented any evidence to rebut this presumption.

***IV. Motion for Recall***

Basha requests an order directing the Counterclaim Defendants to recall all infringing pendants sold to customers. Linea Aurea claims that it has sold 100,000 baby shoe pendants since September 1996. Behnam has not provided a figure of its total sales, although the figure would have to be adjusted to include only those shoes which have been determined to be substantially similar to the Staurino Fratelli pendants.

"[T]he imposition of a recall requirement is well within the district court's broad powers as a court of equity." *Perfect Fit Industries, Inc. v. Acme Quilting Co. Inc.*, 646 F.2d 800, 805 (2d Cir.1981). A district court must consider the likely burden and expense of a recall to the defendant, and balance that burden against the benefit that would accrue to the plaintiff. *Id.* at 807. In this case, the burden to the Counterclaim Defendants in recalling existing stock ordered by other jewelry businesses would not be unduly burdensome. The Counterclaim Defendants need only write a letter to its wholesale customers and pay the cost of the return for customers who comply. *Id.* The recall of wholesale orders would significantly benefit Basha, who has testified that he risks losing customers if the infringing shoes are disseminated in the general marketplace.

However, the recall order will not apply to existing stock ordered by individual customers for personal use. *Eve of Milady v. Impression Bridal, Inc.*, 957 F.Supp. 484, 491 (S.D.N.Y.1997). In *Eve of Milady*, the court issued a recall order as to infringing bridal gowns which had been ordered by retailers, but not as to gowns which had been ordered by individual customers because "such an order would be a source of immediate prejudice to the brides who had planned to wear the defendants' dresses at their weddings." *Id.* In the instant case, the baby shoe pendants are likely presents for new parents, and recall would impose prejudice to the individual customers who have already formed sentimental associations between the pendants and their babies. Recall to individual customers would also impose a greater burden on the Counterclaim Defendants.

***V. Motion for Expedited Discovery***

*20 Basha also moves for expedited discovery pursuant to Rules 30(a), 33(a) and 34(a) of the Federal Rules of Civil Procedure in order to discover the full nature of each counterclaim defendant's infringing activities. District Courts have broad power to permit expedited discovery in appropriate cases, see Rules 26(d), 33(a) and 34(b), Fed.R.Civ.P., and such discovery is routinely granted in

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

actions involving infringement and unfair competition. *See, e.g., Revlon Consumer Products Corp. v. Jennifer Leather Broadway,* 858 F.Supp. 1268, 1269 (S.D.N.Y.1994), *aff'd without opinion,* 57 F.3d 1062 (2d Cir.1995); *Francis S. Denney, Inc. v. I.S. Lab, Inc.,* 737 F.Supp. 247, 248 (S.D.N.Y.1990). Basha's discovery motion will be granted.

*Conclusion*

For the reasons set forth above, and pending a trial on the merits of this action, it is hereby ordered that J.D. Finesse d/b/a Linea Aurea, Katherine Tess Inc. and Behnam are enjoined from manufacturing or selling any baby shoe pendants which are substantially similar to the Staurino Fratelli pendants licensed to Aron Basha. It is also ordered that Behnam and Finesse recall infringing pendants which have been sold to its wholesale customers.

Basha's motion for expedited discovery regarding the full nature of each Counterclaim Defendant's infringing and improper activities is also hereby granted.

It is so ordered.

1997 WL 639037, 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

C
Only the Westlaw citation is currently available.

United States District Court, E.D. Michigan, Southern Division.

George LYNN and Terrance Beauchamp, Plaintiffs,
v.
Dennis RADFORD, et al., Defendant.

No. 99-71007.

March 16, 2001.

Gary E. Levitt, Bloomfield Hills, for Plaintiffs Lynn & Beauchamp.

Johnnie B. Rambus, Lacey & Jones, Birmingham, for Defendant Kenneth Owens.

John P. Timmony, VanOverbeke, Michaud & Timmony, P.C., Detroit, for Defendant Dennis Radford.

Joseph M. White, Patterson, Phifer, & Phillips, P.C., Detroit, for Christopher Hatcher.

Peter G. Rhoades, Detroit City Law Department, Detroit, for City of Detroit & Isiah McKinnon.

MEMORANDUM OPINION AND ORDER DECLARING DISCLOSURE OF INFORMATION BY GOVERNMENT TO PLAINTIFFS NOT TO VIOLATE THE FEDERAL PRIVACY ACT

PEPE, Magistrate J.

*1 Plaintiffs have filed a Section 1983 claim against various Detroit Police Officers, the City of Detroit, the former police chief, the Commander of the Sixth Precinct, and the Detroit Police Department. Pursuant to a Fed.R.Civ.P. 45 subpoena plaintiffs sought information from the Federal Bureau of Investigation ("FBI") regarding its investigation of several officers in the Sixth Precinct. In order to obtain this information from the United State's Attorney, Plaintiffs need a declaration from the Court that disclosure of the information will not violate the Federal Privacy Act, 5 U.S.C. § 552a. Plaintiffs moved for such an order, and the motion was referred for hearing and determination pursuant to 28 U.S.C. § 636(b)(1)(A). On February 15, 2001, a telephonic hearing was held on the motion.

The hearing was adjourned until March 15, 2001, for additional briefing and so that Plaintiffs could detail exactly what information the United State's Attorney was willing to provide to them assuming the Court would enter an order declaring disclosure of the information not to violate the Privacy Act. [FN1] The Court also was to provide notice and limited standing to appear at the subsequent hearing to any parties whose privacy might be infringed by disclosure of the information sought by Plaintiffs. *See Laxalt v. McClatchy*, 809 F.2d 885, 890 (D.C.Cir.1987) ("the broad authority of the District Court in supervising discovery surely affords it the discretion to give such notice itself and ask affected parties to appear" when information sought about them is protected by the Privacy Act).

FN1. Plaintiff is not seeking through this motion information beyond that which the United States Attorney is willing to provide. In order to obtain this information, Plaintiff would need to file an action against the government.

Plaintiffs have submitted the list of information that the United States Attorney is willing to provide. It includes 302 investigative reports by the FBI pertaining to defendants Radford and Hatcher as well as court exhibits from the case of *United States v. Owens and Radford,* 97-81134 (E.D.Mich.1997), a criminal case arising out of the same allegations as in this case. Because defendants Hatcher, Owens, and Radford are represented in this action, no special notice needed to be provided to them regarding Plaintiffs' motion. It is possible that there are other persons mentioned in those court exhibits apart from these defendants or the other defendants in this action. Nevertheless, it was determined that the privacy interests of such individuals is negligible because the exhibits are already part of this district's public court record and are readily available from this Court should the Plaintiffs not be able to obtain the information from the United States Attorney. *Cf. U.S. Department of Justice v. Reporters Committee*, 109 S.Ct. 1468, 1477 (1989) (in finding that FBI rap sheets were subject to the protection of the Privacy Act, "[p]lainly there is a vast difference between the public records that might be found after a diligent search of courthouse files, county archives, and local police stations, throughout the country and a computerized summary located in a single clearinghouse of information"). Unlike the cumbersome, multiple court, possible nationwide search that provided a *de facto* privacy in *Reporters Committee,* here the transcripts and exhibits are clearly identifiable in a single case and only the financial cost of obtaining them would be substantially higher.

*2 Defendant Hatcher relies on the Supreme Court's decision in the *Reporters Committee* case in opposing Plaintiffs' motion. In that case, the Reporters Committee for Freedom of the Press and a CBS news correspondent sought through the Freedom of Information Act ("FOIA") FBI rap sheets concerning four members of the Medico family, a family with alleged links to organized crime. *Id.* at 1473. Justice Stevens considered whether disclosure of these

records " 'could reasonably be expected to constitute an unwarranted invasion of personal privacy' within the meaning of the [FOIA]," 5 U.S.C. § 552(b)(7)(C). [FN2] *Id.* at 1470. After an extensive review of the purposes of the Privacy Act, the purpose fo the FOIA, the history and law around rap sheets, and other case law, Justice Stevens found that such disclosure would constitute an unwarranted invasion of personal privacy:

> FN2. The FOIA and the Privacy Act are interrelated. Under the Privacy Act, "No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by or with the prior written request of, the individual to whom the record pertains, unless the disclosure of the record would be ..." 5 U.S.C. § 552a (b). Thereafter, a number of exceptions to the general rule are listed. One exception, § 552a (b)(2), is for the disclosure of any information required under the FOIA. The other exception, § 552a (b)(11), is for disclosures made pursuant to the order of a court of competent jurisdiction.
> The question in this case is which one of these exceptions should provide the test for the disclosures Plaintiffs seek. If it is the FOIA exception, then the next issue requires analysis of that statute. *See* 5 U.S.C. § 552. The particular provisions analyzed in *Reporters Committee* would be at issue if that were the case. Specifically, the FOIA while allowing disclosure of numerous types of information compiled by the government, will not allow the disclosure of information compiled for law enforcement purposes if it "could reasonably be expected to constitute an unwarranted invasion of personal privacy." § 552(b)(7)(C).

> as a categorical matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no "official information" about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is "unwarranted."

*Reporters Committee*, 109 S.Ct. at 1485. Justice Stevens also clarified that the identify of the individual(s) seeking the information has no bearing on the merits of requests made pursuant to the FOIA. *Id.* at 1481.

Plaintiffs in the brief in support of their motion rely on *Laxalt*, 809 F.2d at 890, *supra*. In that case, the defendants to a libel action sought information from the FBI on Senator Paul Laxalt, and; as here, moved for an order that disclosing it would not violate the Privacy Act. *Id.* at 887. The District Court denied the motion because the defendants had failed to show that they needed the information in question. *Id.* In an opinion by Harry T. Edwards, now Chief Judge of the D.C. Circuit, the Circuit Court reversed:

> The Privacy Act ... does not create a qualified privilege as that concept is generally understood.... Rather, the plain language of the statute permits disclosure "pursuant to the order of a court of competent jurisdiction." 5 U.S.C. § 552a (b)(11) (1982). Neither the statute nor anything in its legislative history specifies the standards for issuance of such a court order. We therefore find no basis for inferring that the statute replaces the usual discovery standards of the [Federal Rules of Civil Procedure ("FRCP") ]... [A] party can invoke discovery of materials protected by the Privacy Act through the normal discovery process and according to the usual discovery standards, and the test of discoverability, is the relevance standard of Rule 26(b)(1) of the FCRP.

*Id.* at 888-889. Judge Edwards went on to state a district court's supervisory powers would often be weightier when the information sought is protected by the Privacy Act. *Id.* at 889. This might require courts to issue protective orders, perform *in camera* inspections, and to inform affected parties in order to promote as much as possible the policies of the Privacy Act. *Id.* at 889-890.

*3 Although *Laxalt* was decided before *Reporters Committee*, there is no reason to conclude that Supreme Court overruled *Laxalt* with its decision in *Reporters Committee* because the cases are distinguishable on a critical element. *Reporters Committee* involved a FOIA request for information from the FBI about members of the Medico family by third parties. In *Laxalt*, the parties seeking information were doing so as part of their discovery in a civil case and the discovery that implicated privacy concerns related to the plaintiff in that case. In such a pretrial case, a party's privacy rights are already modified because each party is subject to the compulsory discovery rules of the court. In such cases, courts have available the protective mechanisms noted by Judge Edwards to lessen the intrusion on the privacy interests of parties. As under *Laxalt*, the Privacy Act allows for disclosure of information that would ordinarily be discoverable in federal courts pursuant to the rules of civil procedure. That *Laxalt* remains good law in the D.C. Circuit in the wake of *Reporters Committee* is evident by the D.C. Circuit's reliance on it in *Lohrenz v. Donnelly*, 187 F.R.D. 1, 8 (D.C.Cir.1999), which discussed *Laxalt* at length. Further, there has not been any contrary authority in the Sixth Circuit [FN3] or elsewhere. Accordingly, the standard set forth by Judge Edwards in *Laxalt* will be the standard utilized here to determine whether Plaintiffs are entitled to an order declaring disclosure of the information they seek from the government not to violate the Privacy Act. [FN4]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

FN3. There is, however, at least one district court decision in the Sixth Circuit which relies heavily on *Laxalt* in addressing the relationship between discovery under Fed.R.Civ.P. 26 and the Privacy Act. *See Gary v. United States,* 1998 WL 834853, No. 98-6964 (E.D.Tenn.).

FN4. Defendant Owens' counsel at the first telephonic hearing cited a case that was purportedly inconsistent with *Laxalt,* and which stood for the proposition that documents regarding criminal investigations cannot be disclosed absent a waiver by those persons investigated, *Fund for Constitutional Government v. National Archives and Records Service,* 656 F.2d 856, 865 (D.C.Cir.1981). That case does not stand for the proposition stated in the context of a discovery request as in this case and *Laxalt.* As in *Reporters Committee,* the *Fund for Constitutional Government* case involved a FOIA request for information regarding criminal investigations. It is inapposite for the same reasons discussed in the text regarding *Reporters Committee.*

There is a concern that allowing parties to obtain information protected by the Privacy Act through discovery will give rise to the filing of lawsuits for the mere purpose of circumventing the Supreme Court's ruling in *Reporters Committee.* There is no such allegation in this case. Plaintiffs allege that they were robbed, falsely arrested, and framed by the defendant (former) police officers. These same allegations were also investigated by the FBI. It is clear that Plaintiffs seek the information compiled by the FBI for the appropriate purpose of preparing their lawsuit. An additional safeguard and reason for assurance in this case is that the FBI does not oppose disclosure of the information. Although the concern about circumventing FOIA is a real one, this is not the proper case for questioning the sensible and persuasive precedent set forth in *Laxalt* for parties properly seeking discovery.

Accordingly, in this case the issue is whether the information sought is relevant or reasonably calculated to lead to the discovery of admissible evidence. *See* Fed.R.Civ.P. 26(b). The relevance of the information sought or the possibility it may lead to admissible evidence is readily apparent. The 302 investigative reports sought on Hatcher and Radford [FN5] pertain to the same allegations in this civil action. Similarly, the criminal trial of Owens and Radford along with the exhibits thereto also relate to these events. Plaintiffs have met their burden under Fed.R.Civ.P. 26(b), and are entitled to the requested information.

FN5. On March 22, 2000, Judge Nancy G. Edmunds entered an order staying the proceedings against defendant Radford in light of the pending appeal of his criminal conviction in the Sixth Circuit. Counsel for defendant Radford at the telephonic hearing on March 15, 2001, for the first time contended that defendant Radford's privacy rights would be infringed by allowing disclosure of 302 investigative reports pertaining to him because of his pending appeal. The undersigned is aware that a stay was granted to protect defendant Radford's right to be free from compulsory self incrimination under the Fifth Amendment. The 302 reports at issue, however, have not been challenged on Fifth Amendment grounds, and there is no apparent Fifth Amendment concern with allowing plaintiffs access to the reports. Further, although there is a stay with regard to defendant Radford in this case, the 302 reports pertaining to him have an independent legal significance. This is because of the allegations of group conduct violating plaintiffs' rights and because plaintiffs need to prove a policy or practice of allowing or encouraging such conduct to prevail against the City of Detroit. *See Sova v. City of Mount Pleasant,* 142 F.3d 898, 904 (6th Cir.1998). Thus, this order is not inconsistent with Judge Edmund's order staying the proceeding against Radford.

*4 Accordingly,

IT IS ORDERED AND DECLARED THAT DISCLOSURE by the government of the information sought by plaintiffs through subpoena, including 302 investigative reports by the FBI pertaining to defendants Radford and Hatcher as well as court exhibits from the case of *United States v. Owens and Radford,* 97-81134 (E.D.Mich.1997), WILL NOT VIOLATE the Privacy Act, 5 U.S.C. § 552a.

SO ORDERED.

2001 WL 514360, 2001 WL 514360 (E.D.Mich.)

END OF DOCUMENT

C

United States District Court, E.D. Tennessee.

David GARY and Brisk Transport, Inc., Plaintiffs,
v.
UNITED STATES of America, Defendant.

No. 3:97-CV-658.

Sept. 4, 1998.

Maurice W Gerard, Eric J Morrison, Stone & Hinds, PC, Knoxville, for David Gary, Brisk Transport, Inc, plaintiffs.

Michael J Martineau, U S Department of Justice, Washington, DC, for USA, defendants.

MEMORANDUM AND ORDER

MURRIAN, Magistrate J.

*1 This case is before the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(a), Federal Rules of Civil Procedure, for disposition by the district court of the plaintiff's motion to compel production of documents [*see* Docs. 7 and 9].

This is an action to recover damages for an alleged unlawful levy by the Internal Revenue Service ("IRS") [Doc. 1]. Specifically, plaintiff contends that on or about January 24, 1995, the IRS filed a Notice of Federal Tax Lien against plaintiff, Brisk Transport, Inc. ("Brisk") regarding certain unpaid employment taxes; that on or about August 1, 1995, a Notice of Federal Tax Lien was filed against plaintiff, David Gary, individually; that Gary was the 100% shareholder of Brisk; that on or about the same day of August 1, 1995, the defendant, through its Knoxville Office of the IRS, sent a Notice of Intent to Levy against Brisk by hand-delivery to the offices of Brisk; that on or about September 6, 1995, the defendant filed a revised Notice of Intent to Levy against Gary, individually; that on that same day, September 6, 1995, the defendant issued a Notice of Seizure to Gary, individually, with respect to a 1984 GMC Brigadier Truck/Tractor, VIN 1GTP9C1C7EV550787, single axle, and in fact seized the truck; that the truck was at all times owned individually by Gary; that despite the fact that the truck was owned individually by Gary at the time it was seized, Gary had not been notified in writing of the defendant's intention to levy upon the taxpayer's property at least thirty (30) days in advance as required under § 6331(d) of the Internal Revenue Code; that the Notice of Intent to Levy had been sent to Brisk and the required notice time period had elapsed, however, the truck was at no time the personal property of Brisk; that the acts of the defendant specifically violated § 6331 of the Internal Revenue Code and the levy and seizure of the truck owned individually by Gary was clearly erroneous and unlawful; that despite the defendant's knowledge of the circumstances surrounding the unlawful levy and despite his efforts to have the truck returned, the defendant continued to intentionally and recklessly refuse to return the truck; and that ultimately Brisk was forced to cease operations; that the actions of the defendant by officers and employees of the IRS were reckless and in intentional disregard of the laws, regulations, and rules of the IRS as they knew or should have known at the time of the seizure that they had unlawfully levied upon the truck and should never have seized same; and that the defendant's actions resulted in substantial economic damages to both Brisk's continued operation and success and to Gary's interest as a shareholder in the corporation [Doc. 1].

Plaintiffs move the court for an order compelling the defendant to produce documents in response to plaintiffs' document request no. 2 which requests the following:

> Louis H. Eades' personnel file and all documents therein, including, but not limited to, performance reviews, complaints, and evaluations.

*2 [Doc. 7, Exhibit 2]. Initially, I note that Louis H. Eades is the Revenue Officer who authorized the seizure of truck at issue. Plaintiffs contend that the documents requested are both relevant and are reasonably calculated to lead to the discovery of admissible evidence under Fed.R.Civ.P. 26(b)(1); that information in Mr. Eades' personnel file could shed light upon any similar actions taken by Mr. Eades; that during his deposition, Mr. Eades stated that during the time in question he felt that there was an "unofficial" financial production quota on agents in terms of dollars collected; that also, prior to the events in question in this action, Mr. Eades admitted that he was disciplined for being "too easy" on a taxpayer; that, thereafter, he received high marks for his collection efforts; that information in Mr. Eades' personnel file could establish a possible motive for illegally seizing the truck or any incentive Mr. Eades may have had by taking certain reckless and intentional actions in violation of the laws, regulations, and rules of the IRS, i.e., meeting collection criteria at the expense of the taxpayer's rights; and that if necessary, the plaintiffs agree to enter into an appropriate protective order to guard against any disclosure of information in Mr. Eades' personnel file outside of the present litigation [Docs. 7 & 8].

The defendant responded to the plaintiffs' motion, contending that Mr. Eades' personnel file is prohibited from disclosure under the Privacy Act, 5 U.S.C. § 552a(b); that there are several exceptions to the prohibition of disclosure in this case, including that Privacy Act protected records may be disclosed "pursuant to the order of a court of competent jurisdiction," § 552a(b)(11); that the test for discovery of Privacy Act protected records is the relevancy standard under Fed.R.Civ.P. 26(b)(1); but that in applying

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

the relevancy standard, the fact that the requested document is a Privacy Act protected record is an important factor; that the information contained in Mr. Eades' personnel file is not relevant to this action; that the "motive" or "incentive" of the revenue officer in taking the allegedly unlawful collection action is irrelevant; that since the information sought in the personnel file relates to collection actions by the revenue officer involving taxpayers other than the plaintiff, the information is irrelevant to the determination of whether the alleged unlawful actions, even if established, constitute a "reckless or intentional" disregard of IRS rules and regulations in this case; that plaintiff has failed to demonstrate how the presence or absence of financial collection goals by the IRS for its revenue officers is relevant to the particular collection actions allegedly taken by Mr. Eades; that plaintiff has also failed to articulate how a letter of commendation or criticism received by Mr. Eades from his group manager regarding his collection activities involving a taxpayer unrelated to the plaintiff is relevant to the factual issues in this case; that even if the revenue officer's personnel file is discoverable in this case, the court should enter a protective order ordering that the personnel file be submitted in camera for the pendency of this case; and that since the case will be tried to the court, the court, based upon the evidence at trial, may make a determination regarding the relevance, if any, of the information contained in the personnel file to the issues under § 7433(a) [Doc. 12].

*3 Plaintiffs have filed suit for damages pursuant to 26 U.S.C. § 7433(a). Section 7433(a) provides, *inter alia*, the following:

> If, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally disregards any provision of this title, or any regulation promulgated under this title, such taxpayer may bring a civil action for damages against the United States in a district court of the United States....

Thus, in order to succeed on their claim, the plaintiffs

> must show not only that unauthorized collection procedures occurred, but that an officer or employee of the Internal Revenue Service recklessly or intentionally disregarded a provision of the Internal Revenue Code.

*Cross Marine, Inc. v. United States of America*, 70 A.F.T.R.2d 92-5494, 92-1 USTC P 50,303, 1992 WL 124788 (E.D.La.1992) (UNPUBLISHED) (emphasis added). Accordingly, I find the defendant's argument that, "the 'motive' or 'incentive' of the revenue officer in taking the allegedly unlawful collection action is irrelevant[,]" to be completely without merit. The revenue officer's intent or motivation in disregarding a provision of the Internal Revenue Code, if at all, is clearly an element of the plaintiff's cause of action.

Mr. Eades testified that he felt that in 1995, there was an unofficial quota for collecting dollars from taxpayers [Doc. 7, Exhibit 1, Eades' deposition at p. 102]; that he believed the unwritten pressure was, the more dollars collected, the better it would be reflected in the group evaluation [*id.*, at 102-103]; that they got graded by teams [*id.*, at 103]; and that he received a letter of reprimand in 1993 or 1994 because he had been too easy on some people and not followed up [*id.*, at 104-106].

It is the plaintiffs' position that Mr. Eades' personnel file regarding other tax collection efforts by him may produce evidence of or lead to the production of evidence regarding Mr. Eades' collection practices. I am of the opinion that Mr. Eades' file could indicate whether Mr. Eades has or has not ever before unlawfully levied and/or seized other property for the reasons alleged in this case, which could demonstrate his awareness of the applicable rules and regulations and how to operate appropriately within them; whether Mr. Eades was under any pressure to collect a certain amount of tax dollars; and whether Mr. Eades had ever before violated any other rules or regulations of the IRS in his collection efforts. In short, I am of the opinion that the plaintiffs should be given the opportunity to develop their case; and that Mr. Eades' personnel file may be one of the few ways to prove his intent or knowledge regarding the collection at issue, whether it be innocent or actionable. Accordingly, I am of the opinion that Mr. Eades' personnel file satisfies the relevancy standard of Fed.R.Civ.P. 26(b)(1).

Defendant is correct that Mr. Eades' personnel file is protected by 5 U.S.C. § 552a(b) which provides that

> *4 [n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless the disclosure of the record would be--[pursuant to certain exceptions to this rule];

* * *

There is no dispute that Mr. Eades has not made a written request for, or provided written consent for, the disclosure of his personnel file. Section 552a(b) sets forth, however, certain circumstances under which Privacy Act records can be disclosed even without the request or consent of the individual to whom the record pertains, such as disclosure "pursuant to the order of a court of competent jurisdiction[.]" 5 U.S.C. § 552a(b)(11).

> [A]bsent an express congressional intent to the contrary, the standards set forth in the FRCP must be followed with respect to discovery requests in District Court. We therefore hold that a party can invoke discovery of materials protected by the Privacy Act through the normal

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

discovery process and according to the usual discovery standards, and the test of discoverability is the relevance standard of Rule 26(b)(1) of the FRCP.
The fact that a document is subject to the Privacy Act is not, however, irrelevant to the manner in which discovery should proceed. Although discovery standards under the FRCP permit access to relevant documents protected by the Act, those same FRCP standards give the District Court ample discretion to fashion appropriate protective orders upon a showing of "good cause." FED.R.CIV.P. 26(c). Where the records sought are subject to the Privacy Act, the District Court's supervisory responsibilities may in many cases be weightier than in the usual discovery context.

* * *

.... [T]he applicability of the Privacy Act to the material requested is a relevant factor for the District Court to consider in determining the appropriate scope and manner of discovery in a given case. As we have noted in the past, such traditional devices as protective orders and in camera inspection offer reliable means with which to give effect to liberal discovery principles without threatening the interests protected by statutory publication bans:

* * *

*Laxalt v. McClatchy*, 809 F.2d 885, 889 (D.C.Cir.1987).

In light of the foregoing, while I am of the opinion that Mr. Eades' personnel file may contain relevant information regarding this case, I am further of the opinion that the disclosure of this file must be made pursuant to a Protective Order, Fed.R.Civ.P. 26(c). The parties are hereby ORDERED to meet and confer regarding the terms of an appropriate protective order regarding Mr. Eades' personnel file. If the parties are unable to agree on the terms of same within ten (10) days of entry hereof, the parties SHALL make application to the court for the entry of a Protective Order. If an agreed protective order is not submitted, the parties shall file their own proposed protective orders within ten (10) days of entry hereof and the undersigned will enter a protective order thereafter.

*5 It is further ORDERED that the plaintiff's motion to compel be, and same hereby is, GRANTED; and that the defendant produce the documents requested within ten (10) days after the entry of a Protective Order.

IT IS SO ORDERED.

1998 WL 834853, 1998 WL 834853 (E.D.Tenn.), 82 A.F.T.R.2d 98-6964

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works